In re C. KEFFAS & SON FLORIST, INC., Debtor.

**Bankruptcy No. 95–87151–288.**

United States Bankruptcy Court, E.D. New York.

Oct. 26, 1999.

## MEMORANDUM AND ORDER RE: TRUSTEE'S FINAL REPORT, AND ALLOWANCE OF FINAL APPLICATIONS FOR COMPENSATION

STAN BERNSTEIN, Bankruptcy Judge.

### Issue:

Under the totality of the facts and circumstances in this chapter 7 case, what should be allowed as (i) a base commission to the trustee under 11 U.S.C. § 326(a), (ii) final compensation (A) to the trustee's prior general counsel and (B) to the trustee's prior accountants under 11 U.S.C. § 330(a)?

### Background:

These issues of compensation stem from a garden-variety chapter 7 business case, one that any experienced trustee who exercises practical judgment could efficiently liquidate within three to four months, and close within sixty days thereafter. The privately-held corporate debtor had owned a retail florist shop. At the time of its filing for bankruptcy relief in December of 1995, the debtor's commercial real estate lease had been terminated as a matter of state law under a judgment of possession and the issuance of a warrant of eviction; the debtor was also delinquent in its obligations to the State of New York for sales taxes, to its secured equipment lenders for installment loan payments, and to its vendors for unpaid invoices for goods and services. According to its amended schedules, the debtor's un-liened assets consisted of (i) $2,500 in cash; (ii) $30,000 in receivables, and (iii) $11,000 in store equipment.

The trustee[1] was appointed to liquidate this modest-sized bankruptcy estate on January 18, 1996. The landlord quickly moved to lift the automatic stay, but the trustee objected based upon the remote possibility of collaterally attacking the judgment of possession.[2] The trustee's objection was, however, overruled by the Hon. Robert John Hall.[3] After obtaining

---

1. To save the trustee any professional embarrassment, the trustee's name will not be mentioned in this opinion.

2. As a matter of state law, the lease had been terminated, and the estate could not claim any interest in the leased premises. If the trustee had expressed the practical concern that the estate needed to retain occupancy of the premises in order to maximize the value of a sale of the tangible personal property, then perhaps the Court would have entered an appropriate order protecting the interest of the lessor and the trustee, conditioned upon the payment in the contract amount as a use and occupancy charge for a period not to exceed 60 days, which could be satisfied from the collection of receivables or from the proceeds of the sale of the tangible personal property. But instead the trustee insisted upon raising the horrible specter of a fraudulent or preferential transfer attack, for which the trustee had no basis in fact to assert. The lessor was put to the unnecessary cost of preparing a well-reasoned memorandum of law refuting the citations of the trustee.

3. This case was first assigned to the Hon. Robert John Hall, and then in anticipation of Judge Hall's retirement, it was reassigned on August 5, 1996 to the Hon. Francis G. Conrad, a visiting judge. The case was reas-

an appraisal at a cost of $750, the trustee negotiated a private sale with an individual who agreed to pay $22,000 for the tangible personal property. (The purchaser also expressed an interest in purchasing the receivables, but the trustee refused to sell them.) On March 19, 1996, the trustee filed his motion to approve an "immediate sale," and that motion was granted under an order docketed on April 6, 1996. Fortunately for the landlord, it was able to negotiate a lease with the purchaser of the tangible personalty. The trustee also persuaded a commercial bank to turn over a balance of $1,314 in the debtor's commercial depository account within this same period.

By April 2, 1996, more than sixty days after appointment, the trustee had collected $3,165 in receivables; the trustee should then have been able to estimate that the gross recovery of the receivables would be, at best, 20 to 25% of the debtor's scheduled amount, or between $6,000 and $7,500. This anticipated low realization would, in large measure, have been attributable to the structure of the receivables— the majority of the accounts were less than $400 per account debtor. These receivables were "house accounts" on open credit, which had been extended to individual and business customers in the delivery area. A trustee should have known from past experience in liquidating receivables of small-sized, single-location, retail businesses that (i) some prepetition payments would have been made on some accounts that were not properly credited by the debtor, (ii) some of the accounts would be subject to legitimate offsets or counterclaims for late delivery, non-delivery, or delivery of flowers that were not fresh or properly arranged, (iii) some of the account debtors would have ceased business operations and their accounts would have been uncollectible, and (iv) the cost of collection of most of these small accounts would exceed any possible amounts recovered.

"At the end of the day," the trustee filed a final report on July 6, 1999. That was a full two and a half years from the date of the trustee's appointment. The final report shows that the trustee liquidated $32,000 in assets, exclusive of disbursements of $2,000. The proceeds of liquidation just sat there in the trustee's commercial savings account, earning interest averaging under 2.5% per year.

In connection with the final report, the trustee sought a commission at the maximum statutory amount of $4,414, and to pay the trustee's former business law firm, which had acted as the trustee's general counsel through calendar year 1996, final compensation of $10,000—this reflected a voluntary reduction of cumulative time charges of $15,000. The trustee waived any claim for legal fees incurred by the trustee's own succeeding law firms.[4] The trustee's prior accountants filed an applica-

---

signed to this judge as of January 1, 1997 when he began administering his own docket.

4. As of December 31, 1996, the trustee withdrew as a partner from the first firm that had represented the trustee as general counsel (first firm) to start another firm (successor firm). The successor firm was later restructured. Through successive motions to substitute general counsel, the trustee continued to rely upon the firm of which the trustee was then a current member. In fact, the time records show that the principal attorneys representing the trustee at the first firm were the trustee and another associate who withdrew to join the trustee in the successor firm. There were no other lawyers at the first firm who rendered legal services to the trustee during 1996. This means that any write-off by the first firm is of hours incurred by the trustee and that of the withdrawing associate. It is also worth noting that at the hearing on the final report, an associate in the trustee's present law firm represented that this firm and its immediate predecessor had incurred another $15,000 in fees, which the firms were writing off—that meant that the total general counsel fees incurred in that case reached $30,000 to liquidate $32,000 in assets, apart from an additional $12,000 for the appraiser and the two firms of accountants. These numbers alone foretell a woefully inefficient administration of the case by the trustee and the trustee's professionals.

tion for final compensation in the amount of $6,000—this reflected a voluntary reduction of its cumulative time charges of $10,-000. Under prior orders of the Court, an appraiser was paid $750 to appraise the tangible assets, and the second accountant was paid $872.04 in fees and expenses for preparing the fiduciary tax returns for the estate.

The U.S. trustee, by an attorney-advisor, submitted a statement in full support of the final report and fee applications on the express ground that the trustee's first general counsel reduced its fees by $5,000, the trustee's successor firms waived all fees, and the first accounting firm reduced its fees by $4,000.

If the Court were to approve the trustee's commission and applications for final professional compensation, as requested, these would have totaled $20,400, and would have resulted in a net distribution to the priority unsecured creditors of $14,000, representing about a 47% distribution on their allowed claims (excluding any consideration of their net opportunity costs). Nothing, unfortunately, would be left to distribute to the estate's unsecured creditors. Another way of restating the results is that the trustee proposed applying 65% of the actual proceeds of liquidation, excluding the accrued interest of $2,464 in the trustee's commercial savings account over the prior thirty months, to satisfy professional expenses. Under any theory, a 65% cost of collection would represent an extraordinary surcharge to priority creditors.

A preliminary memorandum and an interim order was issued by this Court on September 8, 1999; the trustee was given an opportunity to respond to the proposed findings of facts and conclusions of law. The trustee sought and was granted a further hearing on the record. At the hearing, the trustee acknowledged that he was responsible for every aspect of the administration of this case, and that there was no justifiable excuse for what had occurred. Without retracting this frank acknowledgment, the trustee did say that the release of the preliminary memorandum did lead to a very straight talk to the attorney who had assisted him in this case; that as trustee, he had failed to review all of the papers and pleadings filed in this case on his behalf; and that the policies and procedures set forth in his internally-generated, 1,000-page office manual had not been properly followed. Following this second hearing, the trustee submitted a letter, advising the Court that he would not be responding further to the issues.

Findings of Fact:

With respect to the particular history of this liquidation, it was during the first ninety days of the administration of this case—through April 6, 1996—that the trustee realized 90% of the proceeds of liquidation: to wit, the trustee (i) sold the personal property in a private sale for a net of $22,250,[5] (ii) induced the debtor's commercial bank to turn over an account balance of $1,314, and (iii) collected $3,165 in receivables for a total on deposit of $26,730. The trustee's final report shows $7,526 in receivables collected, but that number overstates the total by at least $545 in reversed entries. By our count, the total receivables collected was $6,439. This means that the trustee increased the amounts collected after April 2, 1996 by only $3,275.

A. The Cost–Benefit Analysis: Do I as Trustee Close the Estate or Keep It Open?

After the first week in April of 1996, once the sale of the tangible assets was closed, the trustee had a fairly simple and straight-forward decision to make, based

---

**5.** The debtor may have understated the realizable value of its tangible personal property, although the $11,000 may have reflected the depreciation schedule that met generally accepted accounting principles. Deducted from the gross proceeds of sale of $23,000 is the $750 appraiser's fee.

upon a very conventional (and arithmetic) cost-benefit analysis:

> Now that I have liquidated the tangible personal property, effected a transfer of the debtor's commercial account balance at the bank, and collected the majority of the receivables that I am reasonably likely to realize without substantial additional collection costs, should I(i) move to close this estate and make a distribution to creditors or (ii) keep the proceeds on deposit, which will earn about 2 to 2.5 % in interest per annum when the prime rate is 8% and commercial borrowers in the middle market will have to pay between 2 to 6 points above prime on their unsecured lines of credit, in order to collect more receivables? In order to justify the second alternative, then I will have to collect additional receivables in an amount that will exceed the creditors' opportunity costs with respect to the amounts now on deposit after crediting the trustee's sav-ings rate against those costs and deducting further administrative expenses.

The funds of deposit as of April 6, 1996 were $27,730. If we assume a net opportunity cost of 10% per annum suffered by the unsecured creditors (prime plus 4% less the 2% interest on the trustee's savings account, or 10%)—the cost for them to borrow the monies they were not receiving from the trustee, then the monthly net opportunity cost is $230. [$27,730 × .10/12 = $231.] This means that the trustee had to collect $390 a month to cover the base commission and attorney's fees merely to fund the net opportunity costs. [$390 − $39 (10% base commission) = $351; $351 − $130 (trustee's counsel's fees of 33.3% [6] of $390) = $231.] This applied heuristic is merely intended to quantify how a trustee would use practical judgment.

### B. The History of Collections.

Let us now look at the trustee's record of collections of receivables:

| | | | |
|---|---|---|---|
| Second QTR [7] 1996: | $ 906 | Cumulative total: | $4,071 |
| Third QTR 1996: | $1,671 | | $5,742 |
| Fourth QTR 1996: | $ 382 | | $6,124 |

This record strongly demonstrates that during the second quarter, the trustee reached diminishing returns in the collection of receivables, and had already fallen below the minimum level needed to fund the net opportunity costs. Any doubt that the time had passed for closing this estate was completely erased during the third quarter of 1996. For during the third quarter, the trustee's collection costs skyrocketed when an adversary proceeding had to be brought to collect the few remaining receivables.

In fact, after November 27, 1996, the trustee did not collect a single penny in receivables over the next twenty-seven months. Then on February 4, 1999, the trustee's special collection counsel finally collected a single default judgment, which net of the special counsel's contingent fee and costs, contributed a paltry $291 to the estate. Two other default judgments— each under $300 before adding the filing fee to the judgment—turned out to be uncollectible.

### C. The Litigation Campaign to Collect Receivables.

The trustee failed to supervise his attorneys in the overall litigation strategy for collecting the receivables after April 2, 1996.[8] As a preparatory step to filing a

---

6. The trustee agreed to pay special collection counsel a one-third contingency fee, so for our purposes, that will be deemed a working percentage for the trustee as well.

7. As indicated above, the second quarter is adjusted to run from April 3, 1996 through June 30, 1996.

8. For purposes of this opinion, the trustee and the trustee's attorneys will be treated as the same individual or collective person.

complaint, the trustee sent out a routine demand letter in May of 1996 to delinquent account debtors. The trustee, however, let another three months pass before drafting a complaint against seven account debtors, and the threshold number for joining a defendant was much too low a level of $250. To wait three months before filing a complaint on delinquent receivables was itself negligent. There is no obvious reason why the complaint should not have been filed, if at all, two or three weeks after issuance of the demand notice. But the most compelling evidence of the trustee's seeming indifference to a proper cost-benefit analysis is the amount actually sought to be reduced to judgment. With the exception of one account on which $1,413 was owed, six of the account debtors owed an average of $300, ranging from a low of $295 to a high of $322. Yet the trustee incurred substantial transaction costs by forging ahead to draft a complaint, file it, cause it to be served, prepare pretrial motions, attend preliminary hearings, and submit proposed judgments and other pleadings to the Court to collect a maximum of $1,800 from six of the seven defendants.

At the first pretrial conference, the trustee represented to Judge Francis G. Conrad that the largest claim had been recovered, although a careful review by this Court of the detailed records of the trustee fails to show that specific collection. The trustee's litigation strategy also resulted in the fairly immediate collection of another account for $295. Note that the trustee had to dismiss one defendant because it must have shown that it had no account payable to the estate. This left four more accounts to be collected through litigation, totaling $1,200.

Perhaps the most striking example of the trustee's lack of practical litigation judgment is the row with Intercounty Appliances, one of the remaining four defendants which owed $322. Instead of filing an answer, the defendant's counsel contacted the trustee's office by telephone,

and spoke with a paralegal. In a straightforward and business-like manner, counsel sent a letter by fax and by hard-copy to the firm, dated September 24, 1996, confirming the substance of the telephone conference held that morning—the day before the scheduled pre-trial conference. In the letter, counsel reiterated that his client had checked its records and could not find any outstanding invoice due to the debtor. Counsel then asked for copies of any invoice, and represented that his client, a $350,000,000 corporation would pay them, if due and owing. The letter then concluded:

> Please get back to me as soon as possible. Since this bill is so small, it certainly does not pay for my firm to make a court appearance on a $300 bill.

> If there is any question about this fax, please contact my office immediately.

The trustee moved for the entry of a default judgment the next day when the defendant's counsel "failed to appear." The defendant then moved to vacate the judgment, referencing the letter, and alleged that his letter evidenced an agreement that he would not have to appear at the pretrial conference. This motion triggered a furious four-page refutation by the trustee disavowing any such representation. Paragraph 3 of the reply stated, in relevant part: "[T]he trustee cherishes his unvarnished reputation for honesty and integrity, and resents this gratuitous and unwarranted attack." Judge Conrad then determined that the creditor's motion was not meritorious and denied it. The defendant then paid the principal part of the account balance, all $322. But what did this minor litigation victory (and vindication of the trustee's sullied integrity) cost the estate? It should not surprise anybody that the litigation costs far exceeded the amount collected. The terrible truth is that trustees cannot "afford" to become personally defensive every time a defendant's lawyer suggests anything verging on an impropriety on the part of the trustee or somebody in the trustee's law firm.

When the offense is truly egregious, then sanctions can be sought, although usually a telephone conference among all counsel with chambers remedies the situation in its early stage before the trustee has to "go to the mattresses."

The trustee also took default judgments against the last three defendants. When those defendants did not satisfy their judgments, the trustee incurred the additional cost to the estate of negotiating for the retention of special collection counsel, drafting an application and order, monitoring the status of the collection of those judgments, and preparing interim status reports with the Court. Special counsel was retained to collect $900 spread among three judgment debtors. This effort was counterproductive from the very outset. Nevertheless, in order to maximize this collection effort, the trustee held the estate open for another two years. The special collection counsel ultimately prevailed in remitting a net amount of $290 to the estate from one of the judgment defendants in February of 1999.

All told, the trustee's records reflect a realization of $907 from the prosecution of this seven-defendant adversary proceeding over a period of more than two years. The Court has carefully reviewed the general counsel's time records through 1996, and identified time charges totaling at least $2,253 and a filing fee of $120.[9] So quite apart from the net opportunity costs suffered by the creditors, the prosecution of the complaint would have resulted in a negative recovery of $1,466 if the legal fees were allowed. Even if the trustee can demonstrate that the estate did, in fact, receive the $1,400 from one of the settling defendants, and that the Court somehow missed the relevant entry in the trustee's records, then the trustee barely reached break-even *before taking into consider-*ation the critical matter of the creditors' net opportunity costs.

D. Objections to Claims.

After the trustee had liquidated the great majority of the assets in early April of 1996, the trustee caused the Clerk to issue a "notice of recovery," notifying creditors that they should now file their proofs of claim. The trustee should also have realized by then that it was very unlikely that there would be any distribution to general unsecured creditors, after matching the amounts of the priority claims, as scheduled by the debtor, against the proceeds on deposit. Nevertheless, the trustee directed the estate's accountants to incur professional fees in reviewing the claims and assisting the trustee in preparing objections to claims.

As a result of this costly review, on March 23, 1998—*more than two years from the date of appointment,* the trustee filed objections to three unsecured claims. This is hardly evidence of an expeditious case administration. Again, a critical review of the pleadings again demonstrates a lack of practical and legal judgment on the part of the trustee with respect to two of the three claims. As one of the objections, the trustee sought the subordination of a priority claim for $23,562.01 because it was "tardily filed" by the New York State taxing authority on the third day after the deadline for filing claims. In filing this objection, the trustee's counsel failed to satisfy that attorney's duty under Fed. R.Bankr.Pro. 9011. For as counsel for the State pointed out in a tart but restrained reply to the objection, 11 U.S.C. § 726(a)(1) explicitly excuses tardily filed claims by the taxing authorities when the trustee has not begun to make a distribution to creditors. The trustee's counsel than had to eat a little crow and file yet another pleading withdrawing the objec-

---

**9.** In reviewing the default judgments, the Court discovered that a filing fee of $120 was added to every judgment despite the fact that the trustee went through the effort of gaining permission from Judge Hall to name all seven defendants in one complaint in order to save the estate multiple filing fees.

tion. But the second objection in which the trustee prevailed further manifests the lack of practical judgment: the trustee actually sought to subordinate a general (non-priority) unsecured claim of **$140.60** on the ground that it was tardily filed. Since the creditor defaulted, the trustee prevailed at the hearing. For that trivial success, there can be very little doubt that the cost in professional fees for this entire futile and wasteful exercise of having the accountants review the claims, having the trustee prepare, file, serve, notice, and attend a hearing on two of these objections exceeded by a very substantial measure any conceivable benefit to the estate. What is even more bothersome than the trustee's disrespect for the maxim of *lex curat de minimis* is that there was absolutely no legal or practical purpose to this minor skirmish to degrade the $140.60 claim, for no monies would be distributed to general unsecured creditors in any event, and that fact had to be known by March of 1998 to the trustee. This same pattern of complete inattention to any standard of practical judgment manifests itself in virtually every aspect of the administration of this case.

### E. The Forgotten Fiduciary Returns.

In the spring of 1999, the trustee then belatedly discovered that fiduciary tax returns had not been prepared, so this precipitated moving to retain yet another set of accountants (because the first accounting firm was "too busy," claimed the trustee), and further delayed wrapping up this tardily administered case. Considering that no income was generated by the estate for the last twenty-seven months (other than interest at about 2% per annum on the trustee's savings account) and no more could be collected, the preparation of the returns was an easy task.

### F. The Final Allowance of the Applications for Final Compensation.

As for the other professionals in this case, the Court has determined that the $6,000 requested by the initial firm of accountants should be reduced by $1,000 to reflect the cost it imposed upon the estate when the trustee was forced to employ a second accountant to prepare the fiduciary returns. The Court has some reservations concerning the value of the services performed by the initial accountants in terms of any material benefits to the estate, but in this case, it appears that the accountants were following the trustee's directions and they did not churn the file.

As for the trustee's first firm that acted as general counsel, its application requests $10,000 as final compensation. In this instance, the time charges are largely those incurred by the trustee and the trustee's principal associate, both of whom withdrew from the first firm at the end of calendar 1996. Thus, it is far easier to justify reducing the allowance to the level of benefits to the estate—it is not an adverse reflection on that firm's present competency in bankruptcy practice. The Court has determined that on this criterion, the value to the estate of those professional services are $5,000 for assisting the trustee in the sale of the tangible personal property, and nothing for the litigation services to collect receivables and to object to claims.

Discussion:

 The Court has repeatedly stated on the record at hearings on final reports over the last two and a half years that it expects every chapter 7 trustee to be aggressive, but, at the same time, cost-efficient in administering asset cases. This is simply because any unjustifiable delay on the part of a trustee in effecting a distribution prejudices the creditors, for rarely are there sufficient proceeds to compensate the creditors for the opportunity costs incurred in waiting years for their final distribution. This "lecture" usually ends with the refrain: "It's not your money; it's the creditors' money."

 Under 11 U.S.C. § 326(a), it falls within the discretion of the court to determine the amount of the statutory commis-

sion, if any, which should be paid to the trustee, based upon the amounts actually distributed to creditors of the estate. The Court previously issued a written opinion in *In re Great Northeastern Championship Rodeo & Ranch, Inc.*, Case No. 895–86261 (October 8, 1997) that gave explicit notice to the chapter 7 trustees in this district that any opportunity costs that are unjustifiably suffered by the creditors may be deducted from the trustee's base commission, and any unsatisfied balance in opportunity costs may be borne by the trustee as a personal liability for breach of that trustee's fiduciary duties. This is the first time in close to two years, after reviewing literally hundreds of final reports filed in chapter 7 cases, that this Court finds it necessary to revisit this issue.

The legal predicate for this sanction is that a chapter 7 trustee voluntarily assumes a statutory duty under 11 U.S.C. § 704(1):

> to collect and reduce to property of the estate for which trustee serves, and **close such estate as expeditiously as is compatible with the best interests of parties in interest.**

(Emphasis added).

█ If the trustee fails to make this necessary cost-benefit analysis, then the trustee will necessarily breach the statutory mandate under 11 U.S.C. §704(1), and incur a liability for the damages unjustifiably imposed upon the creditors who would be "in the money," that is, those creditors whose claims will be paid under the distribution scheme that applies in that particular case. This is not an instance of second-guessing the trustee in a retrospective analysis at the end of the case. It is very definitely an *ex ante*, and not an *ex post*, approach that is mandated by the trustee's statutory duty of maximizing the proceeds of distribution to the creditors, net of administrative expenses, and distributing those proceeds as expeditiously as possible. The proper application of this *ex ante* analysis does—it is undeniable—require the exercise of practical judgment.

█ The trustee also breached a statutory duty under 11 U.S.C. § 704(5) by objecting to claims under the facts and circumstances of this case. That section provides that a trustee has a duty "to examine proofs of claim and object to the allowance of any claim that is improper" only *"if a purpose would be served"* by doing so. (Emphasis added.) If a trustee incurs transaction costs for the estate when no purpose would be served by objecting to general unsecured claims, then that constitutes a per se breach of that duty. This is especially true when a trustee goes through the pains of preparing an objection to an unsecured claim of $140 when no conceivable distribution will be made to creditors in that class and objects to the priority treatment of a tax claim without first reading the relevant statutory provision.

█ The case law in this Circuit is well settled on these related issues.[10] In *In re Gorski*, 766 F.2d 723 (2d Cir.1985), in an opinion by then Chief Judge Wilfred Feinberg, the Court of Appeals held:

> There is no question that a trustee in bankruptcy may be held personally liable for breach of his fiduciary duties ... Such liability may attach as the result of negligent, or knowing or intentional breaches.

766 F.2d at 726.

### Conclusions of Law:

Based upon the findings of fact and the discussion of law, the Court concludes that (i) the trustee had a statutory duty to

10. It should be noted that unlike some other circuits which require proof of gross negligence, in this Circuit trustees are held personally liable for mere negligence. The rationale in this Circuit is presumably based upon the underlying policy of holding fiduciaries to a strict standard of performance. See S. Bernstein & L. King, *Collier Compensation, Employment, and Appointment of Trustees and Professional Persons in Bankruptcy Cases* (M. Bender & Co., Inc. 1999), Para. 6. (collecting cases).

maximize the proceeds of collection and to distribute those proceeds as expeditiously as possible under section 704(1), and the trustee also had a statutory duty not to object to general or priority unsecured claims if no purpose would be served by doing so; (ii)(A) the standard for measuring the trustee's performance of the duty under section 704(1) is an *ex ante* model utilizing a cost-benefit analysis that must take fully into consideration the net opportunity costs that the creditors "in the money" will suffer if the case remains open and no distribution is made before approval of the trustee's final report; (ii)(B) the standard for measuring a breach of the trustee's duty under section 704(5) is also an *ex ante* model utilizing a similar cost-benefit analysis that must take fully into account whether the transaction costs in objecting to the general unsecured claims results in any net increased pro-rata distribution to creditors in that class after deducting the administrative expenses in the process; (iii) the trustee materially breached each of those related statutory duties in this case; (iv) the priority creditors suffered substantial net opportunity costs resulting directly from these breaches; and (v) the trustee should be held personally liable for the payment to those priority creditors of those net opportunity costs, after offsetting, as it were, the base commission that would otherwise be payable to the trustee under § 326(a), and the final compensation for the trustee's general counsel must also be reduced to exclude services related to these statutory breaches.

Disposition:

■■■ The aggregate net opportunity costs will be offset against the funds on deposit in the estate that would otherwise be payable to the trustee as a statutory

base commission in the amount of $2,675[11] and any unsatisfied damages will then be recovered as a personal liability of the trustee. The trustee was given an opportunity to demonstrate that the net opportunity costs should be set at another rate, but declined to do so. Thus, this Court is prepared to fix that opportunity cost at the rate of 10% per annum. The total opportunity costs will then be the amount based upon multiplying 27.5% by the $30,000 collected by the estate as of September 30, 1996, or $8,250. (By choosing September 30, 1996 rather than April 6, 1996, the Court has given the fullest benefit of the doubt to the trustee for continuing the case until June 30, 1996, and then building in a rather generous grace period for preparing the final report and final fee applications and completing all fiduciary returns.) After applying the imputed base commission of $2,675, the trustee will be personally liable for the payment of the $5,625 insufficiency to the estate. That insufficiency may be offset against the $5,478.81 in fees and reimbursable costs otherwise payable to the trustee's successor firms as the trustee's counsel. The trustee shall make a further distribution to creditors consistent with this Memorandum.

SO ORDERED.

■■■■■■

---

11. Under the statutory formula in section 326(a), the trustee may be paid a base commission under a formula that is computed upon the proceeds of the estate actually paid to the creditors. The Court has considered that the gross estate consists of $30,000—the amount collected through the third quarter of 1996, and has excluded the $2,400 in interest paid by the bank to the trustee because that amount was already factored into calculating the creditors' net opportunity costs. Since the fees and expenses approved by this Court are $10,750 then the putative proceeds payable to the creditors would be $19,250. The formula permits a maximum of $1,250 on the first $5,000, and 10% on then next $14,250, for a total of $2,675.